May it please the Court. The underlying issue in this case is whether an agency may purchase consolidated software products together with software engineering products in one procurement action, or whether the agency has to conduct a full and detailed investigation of whether a commercial software product meets all or part of the agency requirements. As the Army explained in the October 2015 determination of the contracting officer and Ms. Heidi Shue, what the Army needs in this case is to acquire a complete package of commercial software products together with software engineering services. And so what is happening? Is there a re-procurement? Is that what ensues? Would it ordinarily ensue from this decision? We're here because the Court enjoined the agency from proceeding further with the procurement action. There was a permanent injunction saying that we cannot go any further. With the procurement or with the award that was made? Or no action is taking place? Offers were submitted, which consist of software products and engineering services. The agency was evaluating those offers, and then the Court issued its permanent injunction saying that we cannot go any further until we essentially redo the market research. So the answer is everything has stopped? Is that what you're telling me? You're saying that everything has stopped? There's no procurement? There's no activity of any sort? That's correct. There's no—on D6 increment 2, there's a permanent injunction. As a result of that permanent— An injunction against the award that was made? Yes. No, no, there was no award. To clarify, there's never been an award. The injunction precludes us from going any further unless we redo the market research. So this is a pre-award bid protest? It is a pre-award bid protest. Okay, and so does that mean that the internal development is not proceeding also? That the— The internal development of the information—essentially the subject of the— The procurement is stopped as a result of the permanent injunction. Okay. I have a question for you. I understand that our standard of review is de novo, applying the same standard that was applied by the Court of Federal Claims. So there's a lot in your brief that talks about fully investigating and emphasizing the word fully. You know, given that we're applying a de novo standard of review, we're not bound to follow that requirement of fully or, as you argue, an additional requirement of fully. We're just going to look at the statute, right, and do a de novo review. Is that correct? That's correct. But also, in addition to the statute, the statute directs the court to look to the FAR, the Federal Acquisition Regulation. And it's to the Federal Acquisition Regulation that the court should have looked to, in this case, in deciding whether or not there was a violation of the statute. And what in particular in the FAR do you think specifies that there was an error as compared to looking at the statute itself? I mean, what is the difference that the FAR provides? What the FAR provides is clarification. For example, the FAR in paragraph 2.1.01 defines market research as, quote, collecting and analyzing information about capabilities within the market to satisfy agency needs. It's our contention that the court should have looked to the FAR in interpreting the statute, followed the FAR. But wasn't it that the Court of Federal Claims said that it was really the problem here, she found, was that there was no use or little use of the results of the market research to determine whether there are commercial items. So then how does your definition help in that manner? What the FAR also does is talk to the techniques of doing market research. What about the determination requirement, using the market research to make a determination? Yes. In that respect, what the record showed here was that the contracting officer used the market research in making his determination that there was not either a commercial product or a commercial service that met the entire requirements of increment two. And there, the FAR has very specific definitions of a commercial service and a commercial product that constitute a commercial item. And he relied specifically on those FAR provisions in making his determination. These are separate provisions of the FAR in Section 2.101. Specifically in paragraphs, this is subparagraphs 5 and 6, there is a definition of a commercial service. And he made the determination that the market research showed that there was no commercial service. Do you mean commercial items or do you mean commercial service? I'm looking at the FAR right now, the definitions you're referring to, and I think it's commercial item. Am I incorrect? Yes, but within the definition of commercial item, there are several subparagraphs. And we would direct your attention to the subparagraphs 5 and 6, which deal with services. And for a service to come within a commercial item definition, it must fall within those paragraphs 5 and 6. The contracting officer found, and this is explained in his report to the GAO and also in his declarations, that based on the market research, the engineering services, the software engineering services that were part of Increment 2 do not fall within paragraphs 5 or 6. This is an aspect of the contracting officer's determination that was not addressed by the Court of Federal Claims. The Court did not address the definition of a commercial service, and it did not address the contracting officer's determination that the software engineering services that are part of Increment 2 are not a commercial item. They do not fall within the definition. If I could turn back to the market research itself, the Court here has added this new requirement that we have to have a investigation, a full investigation, of whether a commercial item, for example, Palantir's platform, meets all or part of the Increment 2 requirements. This is not set forth in the FAR, and it's especially unreasonable in the context of D6. The Army knew, based on its experience, that commercial software products were going to be part of Increment 2. In fact, the solicitation requires that the contractor list out all of the commercial software products together with government-owned software products and open-source software products that are going to be part of the whole combination of services that is being provided to the government. The government has not precluded the contractor from using any particular commercial software product. For example, Norfolk could come in, and its proposal, hypothetically now, could include a Palantir platform as part of the solution for Increment 2. What the government did not know in this case is what combination of commercial software products, government-owned software products, open-source software products, plus software engineering services would provide the best value to the government. We're in the record, as that's spelled out. We're in the record? Yeah. I'll cite the court to, this is from the solicitation, that the contractor has to maximize the reuse of GOTS and COTS software products. Appendix page 11877, 11901, 11880. I'm sorry, I apologize. 118, I couldn't hear you. I'm sorry. Can you start over? Yes. I'm slower, I apologize. 11877, 11901, 11880, 11876. Thank you. Further, as I said, the Army hasn't placed any prohibition on the use of commercial software products. That citation would be 10009. The Army's research method in this case was to issue requests for information and then to contact the contracting officers and product managers for the contracts that companies identified and verify the capabilities that companies asserted in response to these requests for information. That's in our brief at the opening brief pages 18, 58, reply brief at 13. The record sites would be 11796, 11826-27, 11841, 12271, and 16350. This was a reasonable method of conducting market research, and there are no hard facts in the record that demonstrate that the Army abused its discretion. What the court suggested as an alternative was that the Army conduct perhaps demonstrations or that the Army engage in a follow-up correspondence with Palantir to read. One of the things the Court of Federal Claims said is that the requests for information were focused on developing as opposed to encouraging the use of commercial products or even seeking information about commercial products. What is your response to that finding? The court did not construe those requests in the context of what the Army knew. The Army knew that it needed both integration and development based on the requirements for Increment 2. What the requests for information ask for is what past experience do you have in integrating? It also said developing, didn't it? Yes, also development, but in integrating with other software products and also developing new software. Now, the reason this is important is because D6 itself is an integrated solution. It includes both government-owned software and commercially-owned software, and whoever is going to take on this task has to be an integrator. They have to have experience in integrating, for example, targeting software, operations-on-the-move software, with other software. So it asked that question. There are also new requirements. Specifically, this is brought out in our brief and also in the record, there is a new requirement for a counterintelligence, human intelligence, single software solution. That's addressed in our opening brief, pages 9 to 10, page 59, and the reply brief at page 12, with the citations being there. This is part of the very first task order, and it would be new development. What it is is a software solution that supports collection, reporting, and mission support functions in accordance with DOD standards, and it builds a software interface between the Army's D6 and the Defense Intelligence Agency's system. There's no commercial marketplace for such services, and there are no commercial products that perform such services. I understand you'd be saying that what was sought here was something that would be the use of commercial products. Maybe we're a practicable combined with integration. You may have already given me these sites, but one thing that I haven't really appreciated from the record that I've reviewed is the emphasis on the commercial items. So is the sites that you gave me earlier your best sites for the government's encouragement of the use of commercial items in responding to the RFI? There are additional sites in our brief. There's a discussion of the December report and the July report, and there I would point the court to our brief and the citations in our brief at pages This is the government's opening brief, pages 49 to 55 to 56, and the reply brief, pages 10 to 11. And there there are citations to specific paragraphs of the market research report that address the capabilities of individual companies. And those paragraphs identify commercial products of those companies, and they assess those companies' capabilities in terms of the products that they have as well as their engineering services. Also, I wanted to ask you, where in the market research report is there a discussion of integration and integration capabilities? It goes through the RFIs, and the RFIs themselves ask for your capabilities at integrating. Specifically, the first and second RFI ask for capabilities in integrating government-owned software with commercially-owned software. That's what the information we were looking for. And specifically, Palantir did not provide that information in response to the second RFI. Do you think integration is discussed in the market research report? It discusses the request for information, quotes those requests, and those requests ask for information about past experience in integration. It was requested, but that's part of the problem, isn't it? I see. It was requested and not provided. Excuse me? It was requested but not provided. Isn't that part of the issue that was before the Court of Federal Claims? I'm sorry, I'm not hearing you. The market research results, these were very far-ranging requests for information. And part of the problem that the Court of Federal Claims was concerned with and relied on was what was viewed as the inadequacy of the response. Isn't that accurate? What the Court did is conclude that the presumption of administrative regularity was overcome. And because of that, it put aside all of the information that the agency had collected in response to the RFIs. It characterized over 1,000 pages of information as being, quote, no evidence. That body of information contains information about commercial products and information about engineering services. And it was all assessed by the Army for each company individually, and they assessed their capabilities of providing the services for increment to, based on the information they provided. Okay. Let's hear from the other side, and we'll save you some rebuttal time. Mr. Olson? Thank you, Judge Newman. May it please the Court. Congress knew exactly what it was doing in 1994 when it unanimously enacted the Federal Acquisition Streamlining Act. It was fed up, Congress, there's ample testimony and congressional hearings, Congress was fed up with wasteful, corrupt, expensive, incompetent development contracts. And therefore, it unambiguously, explicitly, and without a single dissenting vote in Congress, ordered military procurement officials to research and seek out and give a preference to commercial items to the maximum extent practical. In short, what Congress ordered the military services to do is to stop perpetually reinventing the wheel at great expense and great delay and bad results. The Army, in this case, ignored that command. It's important to focus on what Congress explicitly did, and Congress could not have... I'd like to ask you one question. Could I have your response to Ms. Kirshner's reliance on the definition of commercial service? I mean, I understand that the statute is requiring market research regarding commercial items, so I'm having a hard time understanding the relationship there with commercial services. Do you have any thoughts on that? I think, in the first place, the FARC cannot and does not amend the statute itself. And we all know what a commercial product is. It's something that you can go out and buy and purchase. The whole background of the enactment of this statute is, and the statute is specific, it talks in terms of commercial items, and then it says if commercial items aren't available, go to non-developmental items, and then lastly go to a developmental item. Commercial item means that if it's out there in the marketplace and you can purchase it, or you can purchase it with modifications, or if you can suggest modifications in your requirements to make it available to purchase something that already exists, if there are wheels out there, buy wheels. Change your configuration of your product if necessary, but do all of those things to avoid developmental contracts. And it's interesting because Congress could not have been more specific about the fact that it was commanding focus on available items in the marketplace. There's a stipulation, in this case it's Stipulation 3, I believe it is, that says, and this is on page 00816 of the appendix, the Palantir-Gotham platform is a data management platform that is licensed to customers on a commercial item basis. So what this new argument about somehow there wasn't commercial items out there is something that's new to me in this oral argument. I don't see it in the briefing. It's inconsistent with the stipulation itself that the platform that the Army kept saying when these requests for information were all, as the Court of Federal Claims specifically thought about and determined, were all predicated on the notion that the Army started, we're going to develop this from scratch. This is after the first increment, after 15 years, after $6 billion, was deemed by the GAO as inefficient, ineffective, unsustainable, and even by the Army, and this is another stipulation, it's Stipulation 7, which is the very next page of the stipulations, is based on technology that is nearing obsolescence. So what the Army did one time is develop this data management platform from scratch. It was 15 years into it now, $6 billion, and it wasn't working. And so it then, when it decided, and it decided right at the beginning, we're going to develop it from scratch. That's what the Court of Federal Claims found. That's what these requests for information were all about. They're talking about a development contract, and when Palantir came back and said— I asked you a question about that, the DIVA study. Okay, so the DIVA study seemed to be talking about commercial items. You agree with that, right? Yes, it does. Is it part of the market research? And the reason why I ask that is because I pulled the stipulation. I didn't have the full stipulation in my appendix, but I pulled it from the record, and I saw that there was Stipulation Number 10, and it says the Army's market research included the following, and it lists a number of things, but the DIVA study was not included. Right, and it wasn't included in the litigation before the Court of Federal Claims. It wasn't included as a market research item before the GAO, when the GAO considered this. Ms. Kirshner, at the oral argument on page 137, was asked about this and specifically said, the Court said, when was RFI Number 1 issued? She responded, August 2014, beginning the market research. That's on page 137 of that transcript. And the DIVA study, which presupposed various different items, but it preceded the so-called market research, and it wasn't listed before as an item of market research. It did tell the Army, there are commercial items out there. You ought to be considering those commercial items. I think it said there's a rich field of commercial items, but then what the Army did with its request for information is assume we're going to develop it from scratch. When Palantir came back three different times in response to the request for information, he said, we have it. We have a data management platform. It's being used by the Army. It's being requested often by units in the Army. It's being used by the FBI. It's being used by the Marine Corps. It's being used by the Central Intelligence Command. And it's been characterized by the intelligence community as the intelligence community's knowledge management tool. In other words, the RFIs start with the premise that the Army started with, we're going to develop something from scratch. They put out these requests for information, all predicated, tell us what your experience is and what your ability is with respect to development of these items. Palantir came back fully aware of Section 2377, this important statute, unanimously passed by Congress and said, we have commercial items available to you. We can do it all. Come and ask us about it. Did Palantir mention integrating? I just don't recall. Well, if you look at this, I don't know whether the word integrated was in those responses, but if you look at footnote 5 of our brief, there's an evaluation, and I won't get into record pages because that will just slow us down, but it's mentioned in footnote 5 of the brief, there was an evaluation by the government of Palantir's system, which is capable of integration. Of course, that's what knowledge data management platforms do. They take information, they integrate that information, they put it in a way in which you can analyze it and retrieve it, and like your iPhone, it's an open application system, you can put different applications on it. If you want to put a weather thing on it, you want to put something about the geographical terrain, you can put that on it. However, this system is already being used by the Marine Corps, the FBI, for these very same purposes. So this is what this statute is all about. Can I ask you, do you think that was footnote 9? It says Palantir Gotham was designed to be extensible, meaning it features open application programming interferences. Is that the footnote you're referring to? I should have been referring to both of them. It's also footnote 5, and is that page 50? I'm not quite sure. But there's two footnotes that deal with this, plus the stipulations, plus the submissions by Palantir. Now, the fact is we don't really need to know all of these things because the statute is as explicit as it could be. It uses the word preference for commercial items twice. That's the name of the statute, preference for the acquisition of commercial items. And the first word of the statute says preference. Then what the statute does, it says several times, it says maximum extent practicable twice. That's about as strong a language as you could get. It used to say in the earlier draft where practicable, then it was modified to mean maximum extent practicable. There's use of the word shall four times in the statute, and twice it says ensure. So what the statute specifically said is before you do this, before you conduct the solicit, before you solicit bids, before you award contracts, before you develop specifications on three different occasions, you must do research with respect to the availability of products in the marketplace that can satisfy your demands. And not that I think it's necessarily relevant to this case, but are you suggesting that they need to conduct market research, separate market research before each of those, and between each of those events, or just so long as it's before? I think it can be a cumulative process. But what the statute is trying to do, and Congress, as you know, is not always this explicit. This is a pretty explicit statute. It says we want, before you go out there and decide what you want, look at what's available. Then before you determine the specifications again, and before you award a bid, and then speaking of the FAR, there's a provision in the FAR, it's OOC2, which says if you've made all of these determinations, and then you have found that the commercial products aren't available to suit, go back and rethink what you want. Rethink what your requirements are, and then do it all over again. Is that also in Section 2C of 2377 where it says that it should see if commercial products would meet the agency's requirements if those requirements were modified? Yes, and that's the three separate, it's actually four determinations, because it's A, B, C, and there's two components to B. You must use the research which wasn't done. The research wasn't done here because there's no record of it having been done, and the Court of Federal Claims said I've searched the record. We don't find evidence that the research was done, so the research wasn't done. That's a violation of the statute. Then the part that you're referring to then says you must, you shall use the research to ensure and then make these determinations. You must make the determination that whether commercial items are available, whether commercial items can be modified in two different respects, and then thirdly, if that doesn't satisfy the requirements, then go back and rethink your requirements, because maybe if you modify your requirements to some degree, then you will be able to go out and buy something. Instead of spending $6 billion and 15 years on getting something that doesn't work, units of the Army in the field are asking for this Palantir system. There's plenty of records of that. Now, we know that the Army did not do this because the record doesn't reflect the research. It doesn't reflect the determinations in any of these respects, and the Army is now saying, well, we didn't really need to do that. You asked this question before, Judge Stuhl. They say, we don't need to fully. This is page 35 of the Army's opening brief at the bottom. It says, the Court of Federal Claims unfairly imposed a duty on us to fully investigate, to fully explore, to examine, to evaluate. So what the Army is saying to this Court is that what this statute says the Army must do, they don't have to do. Now, this is what this statute is enacted for, again, unanimously. What about the word fully? I mean, I guess the government is concerned that fully is going to later imply something more than what the statute's requiring. Well, the statute says to the maximum extent practicable. Now, that is a common-sense term saying if it is not practicable to do it, if you'd have to drill to the center of the earth, you'd have to put, you know, if there's something that doesn't work. I looked up the term practicable because I thought that this question might cover it. Insofar as it can be done to the maximum extent, you shall do this research, you shall make these determinations. We don't have a record of the research. We don't have the record of the determinations. They weren't done because the Army never intended to comply with this statute. The Army would like this statute to be done. There is some deference that is to be given. I mean, so long as those activities are engaged in. There's some deference, of course, that is to be given to the agency's decision-making. Yes, and I agree with that. Certainly as a reviewing court, and this is de novo, that you would want to give deference to it, but you'd have to have something to defer to. There isn't anything to defer to. There isn't any research in the record to defer to. There clearly are not the determinations that are required by the statute to defer to. The three RFIs use the word developmental 27 times. There's a couple of references to commercial, but that's not what it was all about. The Army was intending to develop this. When there were commercial suggestions in response to the RFIs, what the Army said is those are not responsive, non-responsive. So when the Palantir, my client, was saying, there's a statute here. We have the product. It's commercially available. It's already being used by the government. It's available. We can do the work. And Palantir's expert pointed out that it can do all of the things that the Army is requiring. When the Army's expert was said, what about that? Palantir says they can fulfill all your requirements. The Army's expert said, well, I don't have sufficient knowledge to be able to answer that question. Well, how could you have a more obvious admission by the Army that they didn't do the research when their expert at the end of all of this process says, I don't have sufficient information to answer your questions about the suitability of the product. So we know that Section 2377 wasn't complied with because from the outset this was a developmental project, which Congress said don't do if you can't possibly avoid it. The word commercial suggestions were deemed not responsive. There's no evidence of research. Do you have a site for that testimony where the expert said, I don't have sufficient information? It's in the brief. I don't have it as I stand here at this moment. But what he said was I have insufficient information to answer that question. But all of this is cumulative because it's a cumulative of the fact that the Army never intended to comply with this statute. How do you read the DEVA study? Do you read the DEVA study as suggesting in any way that a commercial item couldn't be used? No, what the DEVA study basically does is before the Army does its research, it said that there are commercial items out there. There's a full range of menu of things that you ought to be looking at. And then what the Army does, they didn't intend to do that. Then they come up with their request for information and they talk about a developmental product. And when someone comes back and says, well, we do have the commercial product, which could have been something that the DEVA study was referring to, they say, well, that's not responsive. So basically that's further proof of the lack of intent right from the beginning to comply with this statute. And it's reinforced by the Army saying we don't have to do the full research or full examination or full review. I mean, when you have a statute that says you must do it to the maximum extent practicable, and then the Army basically says on that same page, it doesn't just say fully investigate. It says we were unfairly put to the test of examining. They use the word examine in their brief or evaluate. Now, the statute wants this process to work. This, what the Army did was write out of existence 2377. And if their decision and their conduct in this case is sustained, that we might as well repeal that statute because this is the classic example of consider what's available, look at it, make determinations so you, giving full deference to the agency, have something to review. They didn't do it. You can't give deference to something that isn't in the record. It's a responsibility when the statute says we shall ensure that this research must be used to make determinations, and those determinations are here. It's a clear case that the Army didn't comply with the statute, never intended to, maybe well-intentioned because they may have thought we'd rather invent it ourselves. But Congress unanimously required them to do so. I have the site. It's on page 57 of our brief. Yeah, 57 of the brief. And then there's a record site there. I just won't read those numbers into it. Where does all of this stand now under the injunction? The injunction is that the Army has been instructed. The injunction I had in front of me a moment ago basically says, which is this is at 00105, that the Army must set aside the solicitation only after the Army has properly and sincerely, I think that means in good faith, complied with 10 U.S.C. 2377 should defendant proceed to award a contract. In other words, don't award a contract until you comply with congressional mandate with respect to how you get to that point. And is your understanding that that's ongoing, or are we waiting to finish the report? It's my understanding, and I don't think it's in the record, but I did ask that same question. It's my understanding that there is some process going on in which there may be some evaluation of commercial items out there going on. I don't know where that exactly is, and I don't think it's in the record. And I do think that as far as what the Court of Federal Claims did, it was fully justified, completely justified on the record, and it's the only outcome that would be appropriate. The process that went on before was not in compliance with the statute. The Army is being told that don't go forward until you comply with what Congress told you to do. Any more questions? Any questions? Thank you, Mr. Chairman. Thank you. Ms. Pershew, we have plenty of time. Thank you, Your Honor. I just want to make a couple points. First of all, this argument about commercial services and having to fall within the definition of a commercial service is not a new argument. It is an argument that was made at the GAO. It was made before the Court of Federal Claims, and it's throughout our appellate briefs before this Court. And the contracting officer in this case, as explained in his declarations that were submitted to the GAO, made particular findings that the software engineering services required for Increment 2 were not a commercial service as defined in the FAR. And he explains that in his declarations, which I'd ask the Court to look to. The second point is just a brief one. D6, Increment 1, was not built from scratch. It is, in fact, comprised of over 150 commercial software products, and this includes software platforms. We're not going to build Increment 2 from scratch. What it requires is a reuse of available commercial software products and government-owned software products to the maximum extent. And that is what is going to be used together with software engineering services to build Increment 2. With regard to the requirement to do market research, what the statute says is that it shall be appropriate to the circumstances, not that it shall be to the maximum extent practicable. I'd also like the Court to look specifically at our brief, which was not fully quoted for the Court. What we objected to was the requirement, the new legal requirement fashioned by the Court of Federal Claims, that we fully investigate, fully explore, examine, evaluate whether all- What about examine? I mean, I hear your concern about the adjective fully investigate. But what's wrong with examine? If I could complete the sentence. The sentence in the brief is whether all or part of agency requirements could be satisfied by a commercially available alternative. We're concerned particularly about the requirement that fully investigate, and also that you make a determination as to whether a commercial software product can meet part of agency requirements. We already know that commercial software products can meet part of agency requirements. There shouldn't be a requirement to go out and do a full investigation of that in the context of D6. What we don't know is what mixture of commercial software products plus government-owned software products plus software engineering services will prove to be the best value to the government. And that's what increment two is supposed to determine, based on a competition between competing proposals that are submitted. The DIVA study was addressed before the Court of Federal Claims and at the GAO. The DIVA study pointed out that there was a need for both integration and development. I had asked about stipulation of fact number 10, which says the Army's market research included the following list of number of things, not including DIVA. Where do I take from that? There are other stipulations about the DIVA study. Is it part of the Army's market research for this project? It's part of the process. That's why the Court of Federal Claims addressed it. That's why the GAO addressed it. It was part of the process. Why is there a stipulation that doesn't include it as being part of the market research? I'm not trying to be difficult. I'm just asking a practical question. The Palantir would not agree to that particular wording. Therefore, there are several paragraphs about the DIVA study. But really, it is just the beginning. And what it tells the Army is that you need both integration and development. Now, I need to explain integration. Integration in the context of D6 is not about bringing in more pieces of data. It's about making the components talk to one another, right? Yes, that's exactly right. It's between, for example, different software platforms. These different software platforms have to be integrated. And it all has to have code going between it that works properly. And this is referred to as glue code. And there has to be integration testing of that glue code. And you test it all against particular military requirements to make sure those military requirements are met. Why wouldn't that integration requirement involve modifying a commercial item so that it would be seeking commercial items and the ability to modify them? It may or may not involve a modification of a commercial product. Perhaps there is a piece of software that is added to a commercial product to build the bridge to another platform. But ultimately, what you have to do is you have to build code that joins into, for example, a government platform. Why isn't the material that Mr. Olson referred to in footnote 5 and footnote 9 of the brief, for example, where it talks about having apps and different things that can be add-ons to Palantir's platform, why wouldn't that be integration or development or modification of the commercial item? It might. For example, if you have something as Palantir, they talk about a toolbox. They take a piece of Lego out of their toolbox and they stick it into their platform, then perhaps that is a modification, certainly a minor modification of their platform because they've got that in their toolbox. But what we're talking about here is bridges that go from commercial software platforms to government-owned software platforms and testing all this new development, new glue code between these software platforms, for example. And that takes engineering services, and the engineering services have to be then tested to see whether it happened. They've actually been successful. Do you think that that integration is unique to the government system being requested here, or do you think integration is required for most commercial systems that involve Palantir's commercial product? Well, I don't think I can speak to the entire universe, but based on the record before the court, integration is necessary to build increment two, and this would be integration between, for example, a government platform. For example, one that's cited in our brief is the DIB. The D6 Integrated Backbone is itself a government software platform, and you have to, in increment two, the contractor will have to integrate the government platform with all of the other software that is part of increment two and then test it against unique military requirements to make sure it all works. Now, those are military requirements. There's no commercial marketplace out there to make sure, for example, software that goes between D6 and the Defense Intelligence Agency. There's no commercial marketplace for software like that. So that would be software that is peculiar to the government. It wouldn't be a modification of an existing commercial product within the definition, nor would it be a commercial service within the definitions in paragraph five and six. I understand what you're saying. I have just one last question, which is, and this goes again to my questions earlier about whether the request for information talked at all about developing as in modifying a commercial item or integrating a commercial item so that it could communicate with the different existing systems. Yes, it does do that specifically because it speaks to development and integration. There are, if I could just have one separate here. This is from the first RFI, quote, contract vehicles your company has been awarded that address the scope of services required to develop and integrate a system such as D6 focused on integrating COTS, and internally developed software products into a software baseline. But it doesn't say anything about commercial, integrating with commercially available software. It says focused on integrating COTS, which is commercial, off-the-shelf software products. And then GOTS is the government-owned software products. And you have to integrate all of these software products into a software baseline, and that's going to be the new baseline. And then I would point the court to the, and the site for that would be appendix 11880. And in response to that, Palantir identified commercial item contracts. Then we asked in RFI number two for more information. We need more information. We want to know the contract vehicles you've had and the domains that your company has experience developing and integrating with these types of software applications or capabilities. So the concern here is what experience do you have integrating with, say, for example, your software product and some other software product. But specifically, we identified the domains that were of concern to the government, and these are peculiarly military domains. For example, counterintelligence and human intelligence, targeting, on-the-move operations, and the DIP. So that's the type of integration experience we were looking for. Thank you. Thank you. Thank you both. The case is taken under submission.